**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| PAULA FAY LANGFORD, | ) | CASE NO. 1:22-CV-00665-CEH |
| | ) | |
| Plaintiff, | ) | CARMEN E. HENDERSON |
| | ) | UNITED STATES MAGISTRATE JUDGE |
| v. | ) | |
| | ) | MEMORANDUM OF OPINION & |
| COMMISSIONER OF SOCIAL SECURITY | ) | ORDER |
| ADMINISTRATION, | ) | |
| | ) | |
| Defendant, | ) | |

## I. Introduction

Plaintiff, Paula Langford ("Langford" or "Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits ("DIB"). This matter is before me by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF No. 21). For the reasons set forth below, the Court AFFIRMS the Commissioner of Social Security's nondisability finding and DISMISSES Langford's Complaint.

## II. Procedural History

On February 13, 2018, Claimant filed an application for a period of disability and DIB, alleging a disability onset date of May 26, 2017. (ECF No. 6). The application was denied initially and upon reconsideration, and Langford requested a hearing before an administrative law judge ("ALJ"). On August 6, 2019, an ALJ held a hearing, during which Langford, represented by counsel, and an impartial vocational expert testified. (ECF No. 6). On August 28, 2019, the ALJ issued a written decision finding Claimant was not disabled. (ECF No. 6). The ALJ's decision became final on June 11, 2020, when the Appeals Council declined further review. (ECF No. 6).

1

Langford appealed to the District Court (ECF No. 6, Ex. 12A) and the matter was returned to the agency through a joint stipulation of the parties (ECF No. 6, Ex. 7A). A second hearing before a different ALJ was held on January 21, 2022. (ECF No. 6, Tr. 1143-1185). The ALJ issued his decision denying DIB on February 9, 2022. (ECF No. 6, Tr. 1097-1142). The decision became final on April 11, 2022, 61 days following the date of the notice. (ECF No 6, Tr. 1098). On April 4, 2022, Claimant filed her Complaint to challenge the Commissioner's final decision. (ECF No. 1). The parties have completed briefing in this case. (ECF Nos. 9-1, 11, 13). Claimant asserts the following assignments of error:

> 1. The ALJ's decision is not supported by substantial evidence as it did not adequately consider Langford's chemotherapy induced peripheral neuropathy or other symptoms related to her history of breast cancer and other developing impairments.

> 2. The ALJ erred in forming his RFC when he failed to properly evaluate the opinions of the treating sources.

> 3. At Step Four of the Sequential Evaluation, the ALJ erred when he failed to consider the effects of Langford's depression on her ability to perform her past relevant skilled work.

(ECF No. 9-1 at 1).

### III. Background

#### A. Relevant Hearing Testimony

The ALJ summarized the relevant testimony from Claimant's statements regarding her impairments:

> In her initial application, the claimant alleged disability due to stage 2 breast cancer, cardiomyopathy, osteoarthritis of the spine with radiculopathy, osteopenia, scoliosis, arthralgia, peripheral neuropathy, disc bulge and facet hypertrophy with flattened nerve root, back pain, and arthralgia of multiple joints (2E). The claimant alleged impairments have made it difficult for her to lift, bend, stand, reach, walk, sit, hear, climb stairs, see, memorize, complete tasks, concentrate, understand, use her hands, and get along with others

(6E/7).

At the hearing on August 6, 2019, the claimant testified that she was diagnosed with stage 2 lobular carcinoma and started chemotherapy in March 2017. The claimant reported that physically during chemotherapy there were times where she could not get out of bed. The claimant reported that she had a mastectomy on her right breast. The claimant indicated that she cannot work now because of the residual effects from the chemo. The claimant reported that she has pain all over her body. She indicated that she suffers from chemo-induced cardiomyopathy, which causes extreme fatigue and shortness of breath. The claimant also testified that she has depression that causes her to stay in bed as well. The claimant reported that she has trouble being around people and will get panic attacks if she is around too many people. The claimant also reported that her back pain is getting worse over time.

At the hearing on January 21, 2022, she noted that she does not drive; she stopped driving about two years ago; she stopped due to panic attacks and foot neuropathy; she last worked in 2017; she worked in accounts payable/accounting; she did not lift anything more than 10 pounds regularly; she was seated most of the time; she also worked as a rent calculation specialist; she calculated rent for clients based on their income; she as mostly seated and did not lift over 10 pounds; she also worked as an international sales assistant; this job was seated primarily and she did not lift more than 10 pounds; and in this job she sold metal pieces (Testimony).

She stopped working due to chemotherapy; she had underwent three separate rounds of the treatment regimen; she exhausted FMLA leave; she was physically unable to get out of bed most days; her doctor agreed that it was time for her to stop working; she received short-term disability; she underwent a mastectomy; she had an additional round of chemotherapy in 2018; her cancer is currently in remission and has not returned; she did not return to work due to fatigue; she has ongoing treatment for depression and anxiety; she has back issues for which she has received injections; she takes four Vicodin per day which causes fatigue and provides partial pain relief; she takes Lyrica for neuropathy in her hands and feet, which is helpful; she has issues with bending due to back limitations; some days the neuropathy and back pain preclude her from doing any chores; she likes to read; she has issues using her hands due to numbness; she drops objects; she burns herself; her hands fall asleep or get numb after 10 minutes of typing; she has issues with some self-care activities due to hand limitations; she has issues buttoning; she has shortness of breath with stair climbing and talking; she does

3

not want to have back surgery, but she has been recommended for it; she has issue standing and walking for more than short periods (10-15 minutes); she is unable to get up from crouching; she can lift 5-10 pounds maximum; she is unable to lift from the floor; she has vertigo and hearing loss due to tinnitus since receiving chemotherapy; she has been recommended for hearing aids, but they are not covered by insurance; she has tinnitus daily, with some days being worse than others; the symptoms impact her ability to sleep; she has to have the phone close to her ear so she can hear; and she has issues with vertigo and dizziness (Testimony).

As to mental health issues, she noted that she has anxiety and depression; her depression is "pretty bad"; she has bouts of depression lasting days; she has panic attacks weekly; and she uses tools she's learned to help with them (Testimony). She also noted that she is able to perform household chores at times, including light dusting of a table at a time, rest, and then try another lighter activity; she has some better days; she cares for a kitten; she likes to read; and she watches television (Testimony).

(ECF No. 6, PageID #: 1145-1146).

## B. Relevant Medical Evidence

The ALJ also summarized Claimant's health records and symptoms:

On February 9, 2017, at Metro Hospital medical imaging showed two areas of abnormalities in the claimant's right breast (1F/42; 2F/126). A biopsy reviled the clamant had infiltrating lobular carcinoma of the right breast (4F/7). From March 24, 2017 until July 7, 2017, at the Cancer Center in Fairview the claimant completed 6 cycles of neoadjuvant chemotherapy with TCH plus Perjeta (2F/22). While treating her cancer the claimant was required to have an echocardiogram every 6 weeks, which at times showed a decreased ejection fraction but largely showed normal findings (2F/22, 169, 192, 243). On August 16, 2017, the claimant underwent sentinel lymph node biopsy and right breast mastectomy, and was found to have no residual carcinoma (2F/22). The claimant developed neuropathy with fibromyalgia from her cancer treatment and admitted to having numbness and tingling in her feet (2F/22; 13F/9). The claimant took Cymbalta to help with her fibromyalgia (13F/13). In late December 2017, the claimant was told to do physical therapy for 8 visits because of her neuropathy in her feet (2F/25). As of January 12, 2018 treatment notes indicate that the physical therapy was having minimal benefit to the claimant (2F/19).

4

Treatment notes indicate that the claimant takes Cymbalta to help with her pain caused by her spinal impairments (5F/15). Medical imaging from the Cleveland Clinic has shown cervical spondylosis most pronounced at the C5-C6 level with mild flattening of the ventral thecal sac (10F/6). Medical imaging from November of 2017 and 2018, showed a disc bulge at the L4-L5 level, right sided facet hypertrophy and right-sided synovial cyst contacts and flattens existing right L4 nerve root (2F/22; 18F/503, 421). Imaging of her right knee from November of 2018, showed lateral meniscal tear (18F/413-416). The claimant also attended physical therapy to help her spine treatment (2F/25). Physical therapy notes indicate that the claimant made some progress when using aquatic therapy (2F/17). On March 16, 2018, Dr. Seema Misbah at the Cleveland Clinic Cancer Center noted that the claimant is physically restricted in strenuous activities, but can ambulate and is able to carry out work of a light or sedentary nature (4F/8).

As to mental impairments, on September 12, 2018, Dr. Kathleen Ashton, diagnosed the claimant with moderate depression and anxiety in adjustment to breast cancer and survivorship (9F/7). Treatment notes indicate that since the claimant's treatment for her breast cancer she presented with a depressed mood and decreased motivation in social interaction (9F/8). Treatment notes further indicate that with help from Dr. Ashton the claimant is learning ways to manage anxiety and depression, with different cognitive behavioral techniques (15F/86). The claimant also started to take Wellbutrin to aide in her treatment. Clinical findings have been a mixed bad finding the claimant depressed and anxious, but has good eye contact, is attentive, and cooperative, with good judgment and insight (10F/16, 19; 11F/6; 15F/87, 129). Then on May 16, 2018, the claimant went to see Dr. Victoria Liao for a psychological consultative examination (6F). Dr. Liao indicated that the claimant is cooperative and related to the exam appropriately and noted that the claimant appeared depressed with a flat affect (6F/5). However, the claimant did report to Dr. Liao, that her activities of daily living are not impacted by her psychological or medical symptoms (6F/4).

An echocardiogram in March and May of 2017 showed stage 1 LV diastolic dysfunction and trivial MR and TR (18F/643-647, 611). As of October of 2017, an echo showed only subtly reduced LVEF compared to prior testing, and trivial TR and MR (18F/539). Additional echos were substantially similar in December of 2017 (18F/486-490), January of 2018 (18F/472), February of 2018 (18F/466), March of 2018 (18F/450), June of 2018 (18F/431), March of 2020 (18F/341), September of 2020 (19F/7-8), and March of 2021 (25F/24).

Imaging of her cervical spine from November of 2017, showed cervical spondylosis, most pronounced at C5-6, with mild flattening of the ventral thecal sac and without effect on the overlying cord (18F/501-503).

On June 14, 2019, her gait was slow; she has severe lumbar pain and reduce range of motion; she had no edema; she had normal strength throughout the upper and lower extremities; her breathing and heart sounds were normal; and her mood and affect were flat (17F/15).

At exam on June 25, 2019, she had normal motor strength in the upper and lower extremities; her gait was normal; she had no edema; her heart and breathing sounds/signs were unremarkable; and her mood and affect were normal (17F/11). Her exam was substantially similar on July 9, 2019 (17F/8). At exam on October 2, 2019, she was fully oriented; her affect was appropriate; her speech was clear; her thoughts were organized; her gait was steady and unassisted; she had 14-16/18 tender points; she had positive facet loading pain in the lumbar spine; and straight leg raises elicited some discomfort (16F/11). Her exams were substantially similar on November 17, 2019 (16F/17) and February 24, 2020 (16F/21). At exam on August 24, 2020, the claimant had no peripheral edema; her left foot as tender to palpation; she had no muscle atrophy or weakness; her right lower extremity had full range of motion and no weakness; and her sensation to touch and pain was intact bilaterally (22F/3-4). On September 3, 2020, the claimant was noted as a passenger on an ATV and was in an accident, fracturing her right leg (19F/9-10). Following the placement of a cast and removal, she had some ongoing pain (22F/14). Imaging from September 2020 of her right ankle/foot showed healing calcaneal fracture, in good alignment (22F/15-16).

At exam on September 29, 2020, the claimant as noted as "fully active, able to carry on all predisease performance w/o restriction"; she was in no acute distress; her breathing and heart signs/sounds were normal; she was alert and oriented times three; her mood and affect were appropriate; and she had signs of mastectomy surgeries (24F/29). At exam on October 22, 2020, the claimant as oriented times three; her mood and affect were normal; her breathing and heart sounds/signs were unremarkable; and she was in no acute distress (38F/4-5).

At a psychological consultative exam on November 9, 2020, the claimant noted that she is able to attend to daily hygiene, perform household chores, shop for groceries, and prepare basic meals, but

6

slowly due to physical pain (23F/4). On exam, she was cooperative; she conversational speed was within normal limits; she displayed no looseness of associations, flight of ideas, or delusions; her receptive language was adequate; she had no problems attending to simple instructions; she appeared sad; she displayed no autonomic indications of anxiety; she was fully oriented; her recall was average; her concentration was below average; her judgment was sufficient; and her insight was adequate (23F/4-5).

At a psychological exam on December 3, 2020, the claimant's mood and affect were depressed and anxious; her grooming was fair; her eye contact was normal; she was fully oriented; her attention and concentration were normal; her speech was normal; her thought process was unremarkable; her thought content was normal; her intellectual functioning was average; her insight intact; and her judgment was normal (24F/24). Her exam was substantially similar on March 3, 2021 (25F/17).

At exam on December 7, 2020, the claimant had PT following a right heel injury from August of 2020 (24F/16). On exam, aside from her right heel/foot/ankle; she had no tenderness in the left lower extremity; her sensation was intact to light touch in both lower extremities; she had reduced range of motion in the ankles; she had reduced bilateral lower extremity strength primarily in the knees and hips; and her gait was with a crutch (due to right foot injury) (24F/18).

MRI of her lumbar spine dated June of 2021, showed grade 1 spondylolisthesis with significant superimposed dorsal facet arthropathy and facet ligamentous hypertrophy; significant further progression in her central bilateral lateral recess stenosis; and very minor spondolytic features at the L5-S1 level evidence by subtle signal attenuation on her 12 weighted sagittal sequences without significant associated ventral vertical loss of disc height are superimposed dorsal spondylosis or facet and ligamentous hypertrophy (31F/4-5).

On July 15, 2021, she stood erect and ambulated with a normal narrow-based gait; she was able to heel-toe walk without difficulty; she had some limited range of motion in the lumbar spine; sensation was intact to light touch and pinwheel, but diminished in stocking pattern from the knees distally; straight leg raise testing was negative; and there was no apparent muscle atrophy (31F/3).

After a consultation for back pain with James Anderson, M.D. on August 19, 2021, Dr. Anderson noted that spine surgery was not

likely appropriate as "her pain and demonstration of pain is out of proportion to what I am seeing on the films" (29F/1). On exam, Hoffman's signs were negative; straight leg raise testing was positive at 10 degrees bilaterally; her speech was normal; she was hyposensitive in the left upper back, lateral anterior arm, left lateral hand, left anterior and lateral thigh; she has paresthesia in both feet; her pulses were intact; she had 3+ reflexes in the knees but was otherwise normal throughout; her strength was 4+ in the biceps, wrists, finger abduction, grip, knees and ankles; she had 5/5 strength otherwise; and she had some reduced cervical and lumbar range of motion (29F/3).

On September 22, 2021, she was appropriately groomed; she made good eye contact; her speech was appropriate; she reported her mood was "horrible"; her affect was dysthymic; her thought process was linear and goal-directed; her attention/concentration were intact; her recent and remote memory were intact; and her insight and judgement were fair (35F/390).

On November 24, 2021, the claimant received a lidocaine injection the lumbar spine (33F/1). She record shows physical therapy, medication, and injection treatments for her musculoskeletal issues.

The claimant's physician, Joshua Goldner, M.D. noted that the claimant's "pain severely impact quality of life and activities of daily living" and she was discharged from pain management due to high levels of alcohol in her urine screen and non-compliance (34F/1). The claimant responded that she had just one glass of wine with her daughter to cause such a result, but the record notes "however this is a significantly higher amount than a glass of wine" (36F/30).

(ECF No. 6, PageID #: 1147-1150).

## C.  Opinion Evidence at Issue

### 1.  State Agency Psychological Consultant, Jennifer Swain, Ph.D. (05/17/21) (11A/4-9).

On May 17, 2021, state agency psychological consultant Jennifer Swain, Ph.D. provided her opinion on Langford's mental functioning abilities. (ECF No. 6, Tr. at 1215-1216, Ex. 11A at 4-9). Swain opined that Langford had a mild limitation in her ability to understand, remember, or apply information and moderate limitations in her abilities to interact with others, concentrate,

persist, or maintain pace, and adapt or manage herself. (ECF No. 6, Tr. at 1215, Ex. 11A at 4). She opined further that the claimant can perform duties which are static and changes can easily be explained, in a setting without strict production demands; she can engage in occasional, superficial interaction with coworkers and supervisors; and she is able to perform duties which are routine and predictable in a setting where changes that do occur can be previewed prior to implementation (11A/8-10). The ALJ found Swain's opinion persuasive.

### 2. Treating physician, Sanjay Choudhary, M.D. and Tanya Makowksi, CNP (July 9, 2019, and restated/adopted on December 14, 2021) (14F/1-4 & 30F/1-5).

On July 9, 2019, certified nurse practitioner Tanya Makowski completed a "Physical Medical Source Statement" on behalf of Langford. (ECF No. 6, Ex. 14F). The Statement was also stamped by Dr. Sanjay Choudhary. (ECF No. 6, Tr. 948, Ex. 14F at 4). Makowski had been treating Langford for approximately two months and indicated that Langford had "significant tenderness, tightness, weakness, [and] no fine motor skills or ability to grasp". (ECF No. 6, Tr. at 945, Ex. 14F at 1). Makowski opined that Langford could sit for 15 minutes at a time, stand for 10 minutes at a time and sit and stand/walk for less than two hours total in an 8-hour workday. (ECF No. 6, Tr. at 946, Ex. 14F at 2). Makowski opined that Langford would need unscheduled breaks during the workday for 15-20 minutes occurring approximately every hour. (ECF No. 6, Tr. at 946, Ex. 14F at 2). Makowski opined that Langford could never lift over 20 pounds but gave no opinion on Langford's ability to lift ten pounds or up to ten pounds. (ECF No. 6, Tr. at 947, Ex. 14F at 3). Makowski opined that Langford had significant limitations with reaching, handling, or fingering and indicated that she could grasp, turn, or twist objects only 5% of the time; never engage in fine manipulations; reach in front of her body 5% of the time; and reach overhead 2-3% of the time. (ECF No. 6, Tr. at 947, Ex. 14F at 3). She opined Langford would be off task 25% or more of the

time, was incapable of even "low stress" work, was likely to have good and bad days, would be absent more than four days per month due to her limitations. (ECF No. 6, Tr. at 947-948, Ex. 14F at 3-4). When asked to describe other limitations that would affect Langford's ability to work, Makowski stated "ptsd, anxiety, depression, neuropathy". (ECF No. 6, Tr. at 948, Ex. 14F at 4). On December 14, 2021, Makowski reviewed and adopted the July 2019 opinion without changes or additions. (ECF No. 6, Tr. 2730, Ex. 30F at 1).

The ALJ found Choudhary and Makowski's opinions unpersuasive.

### 3. Kathleen Ashton, Ph.D., ABPP and Laurel Ralston, D.O. (June 27, 2019) (12F)

On June 27, 2019, Dr. Kathleen Ashton and Dr. Laurel Ralston completed a "Mental Impairment Questionnaire" on behalf of Langford. (ECF No. 6, PageID #: 12F). With respect to Langford's ability to sustain concentration and persistence, they opined that Langford had no useful ability to manage regular attendance and be punctual within customary tolerance and would be unable to meet competitive standards in: maintaining attention and concentration for extended periods; performing activities within a schedule; working in coordination with or in proximity to others without being distracted by them; completing a normal workday and workweek without interruptions from psychologically based symptoms; and performing at a consistent pace without an unreasonable number and length of rest periods. The remainder of Langford's mental functions were opined to be either limited but satisfactory or seriously limited but not precluded. (ECF NO. 6, Ex. 12F at 1-2). "Seriously limited, but not precluded means ability to function in this area is less than satisfactory, but not precluded in all circumstances. Individual would be limited in their ability to perform activity 15% of time." (ECF No. 6, Ex. 12F at 1-2). "Unable to meet competitive standards means your patient cannot satisfactorily perform this activity Independently, appropriately, effectively and on a sustained basis in a regular work setting." (ECF No. 6, Ex. 12

at 1-2). "No useful ability to function, an extreme limitation, means your patient cannot perform this activity in a regular work setting." (ECF No. 6, Ex. 12F at 2). Ashton and Ralston opined that Langford would be absent two to three days a week due to her mental impairments. (ECF No. 6, Ex. 12F at 2). Finally, Ashton and Ralston opined that Langford's impairments would cause her to be off task 50% of the workday. (ECF No. 6, Ex. 12F at 2). On December 16, 2021, Ashton reviewed the June 2019 opinion and her current treatment notes and affirmed the limitations contained in that opinion were consistent with Langford's (then) current level of functioning. (ECF No. 6, Ex. 37F at 3).

The ALJ found the opinions unpersuasive.

### 4. Consultative Examining Psychologist, Bryan Krabbe, Psy.D., (November 9, 2020) (23F).

On November 9, 2020, upon referral by the Ohio Division of Disability Determination (DDD), consultative examiner Bryan Krabbe, Psy.D., examined Langford to assess her mental status as it related to her claim for disability benefits due to a psychological impairment. (ECF. 6, Tr. 2444, Ex. 23F). Krabbe opined that Langford is able to manage funds; she was below average on brief abstract reasoning, showing difficulty understanding instructions; she performed adequately on short-term memory tasks; she had difficulty maintaining attention and focus; her impairments may affect her level of engagement with coworkers and supervisors; and her impairments may compromise her ability to respond to work pressures. (ECF No. 6, Tr. 2448-2449, 23F at 5-6).

The ALJ found this opinion less than persuasive.

### IV. The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

3. The claimant has the following severe impairments: breast cancer status-post right breast mastectomy; peripheral neuropathy with fibromyalgia; heart disease; spine disorders; lower limb fractures; depressive disorders; anxiety disorders; and posttraumatic stress disorder ("PTSD") (20 CFR 404.1520(c)).

(ECF No. 6, PageID #: 1135).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

(ECF No. 6, PageID #: 1136).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except handle, finger, and feel frequently bilaterally; frequently push/pull with the bilateral lower extremities; climb ramps and stairs occasionally; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; never work at unprotected heights, near hazardous machinery, or perform commercial driving; can understand, remember, carry out, and complete tasks with no strict production rate pace requirements; can adapt to occasional superficial interactions with supervisors, coworkers, and the public, with "superficial" defined as no arbitration, mediation, negotiation, confrontation, or being responsible for the safety or supervision of others; and can adapt to routine workplace changes.

(ECF No. 6, PageID #: 1144).

6. The claimant is capable of performing past relevant work as an accounting clerk (216.482-010, SVP 5, sedentary) and traffic-rate clerk (214.362-038, SVP 5, sedentary). This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

(ECF No. 6, PageID #: 1164). Additionally, the ALJ found that "[i]n addition to past relevant work, there are other jobs that exist in significant numbers in the national economy that the claimant also can perform, considering the claimant's age, education, work experience, transferable skills, and residual functional capacity (20 CFR 404.1569, 404.1569a and

12

404.1568(d))." (ECF No. 6, PageID #: 1165). The ALJ then made alternative findings for step five of the sequential evaluation process. (ECF No. 6, PageID #: 1165-1166).

## V. Law & Analysis

### A. Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### B. Standard for Disability

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that

impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

### C. Discussion

#### 1. The ALJ did not err in his Step Three analysis of Listing 11.14 nor in the formulation of the RFC.

Under the umbrella of a single assignment of error, Langford attempts to raise numerous discrete and unrelated arguments in a manner that is neither clear nor appropriately developed. (ECF No. 9-1 at 12-22). This Court has undertaken to parse out those arguments that meet at least the bare minimum of requirements to identify an issue for determination by this Court. "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997); *see also Ray v. Saul*, No. 1:19-CV-01880, 2020 WL 5203493, at *10 (N.D. Ohio Sept. 1, 2020) (finding conclusory and undeveloped arguments waived). It insufficient to simply reference issues in passing without an appropriately developed argument.

This Court finds that the following issues were identified and argued under Langford's stated first issue: (a) whether the ALJ erred at Step Three by failing to adequately consider Langford's chemotherapy induced peripheral neuropathy or other symptoms related to her breast cancer when finding that she did not meet Listing 11.14; and (b) whether the ALJ erred when formulating the RFC by failing to properly consider Langford's side-effects from chemotherapy. Any other issues identified by Langford were raised in a perfunctory manner, without developed argument, and are therefore deemed waived. *McPherson*, 125 F.3d at 995–996.

### a. The ALJ's determination at Step Three is supported by substantial evidence.

Langford first argues that the ALJ erred by failing to adequately consider her chemotherapy induced peripheral neuropathy or other symptoms related to her breast cancer when finding that she did not meet Listing 11.14. (ECF No. 9-1 at 12-21).

At Step Two, the ALJ determined that Langford has, among her other impairments, the severe physical impairments of breast cancer status-post right breast mastectomy and peripheral neuropathy with fibromyalgia. (ECF No. 6, PageID #: 1135). At Step Three, a claimant has the burden to show that she has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant meets all of the criteria of a listed impairment, she is disabled; otherwise, the evaluation proceeds to Step Four. 20 C.F.R. § 404.1520(d)-(e); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 653 (6th Cir. 2009) ("A claimant must satisfy all of the criteria to meet the listing.").

In evaluating whether a claimant meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an

explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (noting that, without such analysis, it is impossible for a reviewing court to determine whether substantial evidence supported the decision). The ALJ's evaluation of the medical listings need not directly address every piece of evidence a party submits. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006).

However, remand is not necessary if the lack of analysis at Step Three is harmless. *Kado v. Colvin*, No. 1:15-CV-02044-DAP, 2016 WL 6067779, at *7 (N.D. Ohio Oct. 17, 2016) (citing *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014)). "[T]he claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014) (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)). "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Id.* at 433; *see also Forrest*, 591 F. App'x at 366 (finding harmless error when a claimant could not show that he could reasonably meet or equal a listing's criteria).

First the Court must determine whether there was error. Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 404.1525(c)(3). If the claimant's impairment is listed, the ALJ must look at the listing and determine whether the claimant satisfies all of the criteria to "meet" the listing. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). Additionally, when the claimant suffers from fibromyalgia, the ALJ must consider the guidance given in SSR 12–2p which provides:

> At step 3, we consider whether the person's impairment(s) meets or medically equals the criteria of any of the listings in the Listing of Impairments in appendix 1, subpart P of 20 CFR part 404 (appendix 1). FM cannot meet a listing in appendix 1 because FM is not a listed impairment. At step 3, therefore, we determine whether FM medically equals a listing (for example, listing 14.09D in the listing

> for inflammatory arthritis), or whether it medically equals a listing in combination with at least one other medically determinable impairment.

SSR 12–2p at *6.

Here, in regards to Langford's peripheral neuropathy, the ALJ's analysis and conclusion is as follows:

> The claimant's impairments do not meet or equal the necessary criteria of 11.14, for peripheral neuropathy, because the evidence of record does not establish that the claimant has a disorganization of motor function in two extremities (see 11.00D1), resulting in an extreme limitation (see 11.00D2) in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities, as required for 11.14A. The claimant's examination findings of record do not support such a degree of physical limitation. Also, the evidence of record does not establish the necessary criteria for 11.14B, as the claimant does not have a marked limitation (see 11.00G2) in physical functioning (see 11.00G3a), and in one of the following: (1) understanding, remembering, or applying information (see 11.00G3b(i)); or (2) interacting with others (see 11.00G3b(ii)); or (3) concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or (4) adapting or managing oneself (see 11.00G3b(iv)). The claimant does not have a marked limitation in physical functioning, as demonstrated by the physical examination findings. Also, the record does not support that the claimant has experienced any significant or marked degree of limitation in these areas of functioning discussed in subsections 11.00G3b(i) to (iv). Accordingly, the evidence of record does not satisfy the necessary criteria of Listing 11.14.

(ECF No. 6, PageID #: 1137).

Langford argues that the ALJ failed to provide any support for his conclusion that Langford did not have the requisite limitations. (ECF No. 9-1 at 18). The Court agrees. The ALJ's Step Three analysis did not actually evaluate the evidence, compare it to the listed impairment, or give an explained conclusion. *See Reynolds*, 424 F. App'x at 416. Although the ALJ recited the requirements for meeting the listing and concluded that Langford did not meet the listing, he failed to explain how he reached his conclusion. Although there is no heightened articulation required at

17

Step Three, "an ALJ must nevertheless articulate findings that will permit meaningful judicial review of his findings." *Id*. at *11 (citing *Hunter v. Comm'r of Soc. Sec.*, No. 1:09CV2790, 2011 WL 6440762, at *3–4 (N.D.Ohio Dec.20, 2011). Accordingly, the ALJ failed to adequately articulate his findings in his Step Three analysis.

However, the court may look to findings elsewhere in the ALJ's decision to support the Step Three conclusions. *Forrest*, 591 F. App'x. at 365-66 (upholding the ALJ's Step Three findings where "the ALJ made sufficient factual findings elsewhere in his decision to support his conclusion."); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (reasoning that there is no need to require the ALJ to "spell out every fact a second time under the step three analysis."); *Snyder*, 2014 WL 6687227, at *9 ("[I]t may be proper to consider the ALJ's evaluation of the claimed impairments at issue at other steps of his decision."). Upon looking at the broader decision, the Court finds that substantial evidence supports the ALJ's decision that Langford did not meet or equal a Listing.

Listing 11.14 sets forth the objective medical and other findings needed to satisfy the criteria for disability for peripheral neuropathy. 20 C.F.R. Part 404, Subpt. P, App. 1, § 11.14. To demonstrate disabling peripheral neuropathy, a claimant must show either:

> A. Disorganization of motor function in two extremities (see 11.00D1), resulting in an extreme limitation (see 11.00D2) in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities.
>
> OR
>
> B. Marked limitation (see 11.00G2) in physical functioning (see 11.00G3a), and in one of the following:
>
> 1. Understanding, remembering, or applying information (see 11.00G3b(i)); or
> 2. Interacting with others (see 11.00G3b(ii)); or
> 3. Concentrating, persisting, or maintaining pace (see

11.00G3b(iii)); or
4. Adapting or managing oneself (see 11.00G3b(iv)).

20 C.F.R. Part 404, Subpt. P, App. 1, § 11.14.

Listing 11.14(A) requires an "extreme limitation". An "extreme limitation" means:

the inability to stand up from a seated position, maintain balance in a standing position and while walking, or use your upper extremities to independently initiate, sustain, and complete work-related activities. The assessment of motor function depends on the degree of interference with standing up; balancing while standing or walking; or using the upper extremities (including fingers, hands, arms, and shoulders).

a. Inability to stand up from a seated position means that once seated you are unable to stand and maintain an upright position without the assistance of another person or the use of an assistive device, such as a walker, two crutches, or two canes.

b. Inability to maintain balance in a standing position means that you are unable to maintain an upright position while standing or walking without the assistance of another person or an assistive device, such as a walker, two crutches, or two canes.

c. Inability to use your upper extremities means that you have a loss of function of both upper extremities (including fingers, wrists, hands, arms, and shoulders) that very seriously limits your ability to independently initiate, sustain, and complete work-related activities involving fine and gross motor movements. Inability to perform fine and gross motor movements could include not being able to pinch, manipulate, and use your fingers; or not being able to use your hands, arms, and shoulders to perform gross motor movements, such as handling, gripping, grasping, holding, turning, and reaching; or not being able to engage in exertional movements such a lifting, carrying, pushing, and pulling.

20 C.F.R. Part 404, Subpt. P, App. 1, § 11.00(D)(2).

Throughout his decision, the ALJ discusses Langford's peripheral neuropathy and the objective medical records indicating her normal strength throughout her upper and lower extremities, normal sensation to touch and pain, and no muscle atrophy or weakness. (*See* ECF

19

No. 6, PageID #: 1148-1151). For example, the ALJ noted several medical observations that Langford was "fully active, able to carry on … without restriction", that she was able to "attend daily hygiene, perform household chores, shop for groceries, and prepare basic meals", and she was able to "heel-toe walk without difficulty". (ECF No. 6, PageID #: 1150-1151). The ALJ noted that although Langford stated her balance was "slightly off" in November 2017, she "consistently denied gait or balance disturbance." (ECF No. 6, PageID #: 1151). The evidence supports the ALJ's conclusion that Langford did not suffer from an extreme limitation as required by Listing 11.14(A). The Court notes that Langford fails to cite to any evidence the ALJ failed to consider that shows an inability to stand up from a seated position, maintain balance in a standing position and while walking, or use her upper extremities to independently initiate, sustain, and complete work-related activities, as required by Listing 11.14(A).

Listing 11.14(B) requires a marked limitation in physical functioning *and* in at least one of the areas of mental functioning as explained in Listing 11.00(G)(2) and (3). Langford focuses her argument on her limitation in physical functioning. (ECF No. 9-1 at 18). However, even assuming that Langford suffered from a marked limitation in physical function, she must also suffer from a marked limitation in at least one area of mental functioning to satisfy the listing requirements. The ALJ thoroughly explained his conclusion that Langford did not have a marked limitation in any of the areas of mental functioning. (ECF No. 6, PageID #: 1139-1144 (finding that Langford had no more than moderate limitations in her mental functioning)). Specifically, the ALJ found that Langford had a mild limitation in her ability to understand, remember, or apply information (ECF No. 6, PageID #: 1139-1140), and moderate limitations in her ability to interact with others (ECF No. 6, PageID #: 1140-1141); concentrate, persist, or maintain pace (ECF No. 6, PageID #: 1141-1142); and adapt or manage herself (ECF No. 6, PageID #: 1142-1143). The ALJ supported his

conclusions by citing to Claimant's hearing testimony, her conflicting statements as to her level of functionality, and the medical record, examination reports, and medical opinion evidence. (ECF No. 6, PageID #: 1139-1144). Langford does not challenge the ALJ's mental function limitation findings at Step Three. (*See* 9-1 at 18-21). Accordingly, substantial evidence supports the ALJ's conclusion that Langford did not suffer from a marked limitation as required by Listing 11.14(B).

Moreover, even if the ALJ had erred in his explanation at Step Three, the error here would have been harmless as Langford has not met her burden to demonstrate that she meets the Listing. *Smith–Johnson*, 579 F. App'x at 432 (As the claimant has the burden of proving that they meet a listing at Step Three, "the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing."). The Sixth Circuit has observed that "courts generally should exercise caution in conducting harmless error review" of a step three finding because harmlessness "may be difficult, or even impossible, to assess." *Rabbers*, 582 F.3d at 655-658.

Here, Langford presents several diagnoses of neuropathy and subjective reports of "pain, tingling, and numbness" in her hands and feet. (ECF No. 9-1 at 11-19). However, Langford fails to cite to any evidence that the ALJ failed to consider that shows an inability to stand up from a seated position, maintain balance in a standing position and while walking, or use her upper extremities to independently initiate, sustain, and complete work-related activities. (ECF No. 9-1 at 11-19). Thus, she fails to meet her burden to demonstrate an extreme limitation needed to qualify for disability under Listing 11.14(A).

Additionally, Langford has not demonstrated that she met the definition of Listing 11.14(B). Listing 11.14(B) requires a marked limitation in physical functioning and in at least one of the areas of mental functioning as explained in Listing 11.00(G)(2) and (3). Although Langford

argues that the ALJ erred in his analysis that she did not meet a marked limitation in physical functioning, Langford only briefly hints at the mental functional limitation requirement. (*See* ECF No. 9-1 at 19-20). "When a claimant alleges that he meets or equals a listed impairment, he must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 728 (6th Cir. 2004).

Listing 11.00(G)(2) states that

> To satisfy the requirements of the functional criteria, your neurological disorder must result in a marked limitation in physical functioning and a marked limitation in one of the four areas of mental functioning (see 11.00G3). Although we do not require the use of such a scale, "marked" would be the fourth point on a five-point scale consisting of no limitation, mild limitation, moderate limitation, marked limitation, and extreme limitation. We consider the nature and overall degree of interference with your functioning. The term "marked" does not require that you must be confined to bed, hospitalized, or in a nursing home.

20 C.F.R. Part 404, Subpt. P, App. 1, § 11.00.

Listing 11.00(G)(2)(b) states that a marked limitation in mental functioning means that

> due to the signs and symptoms of your neurological disorder, you are seriously limited in the ability to function independently, appropriately, effectively, and on a sustained basis in work settings (see 11.03G3). We do not define "marked" by a specific number of mental activities, such as: the number of activities that demonstrate your ability to understand, remember, and apply information; the number of tasks that demonstrate your ability to interact with others; a specific number of tasks that demonstrate you are able to concentrate, persist or maintain pace; or a specific number of tasks that demonstrate you are able to manage yourself. You may have a marked limitation in your mental functioning when several activities or functions are impaired, or even when only one is impaired. You need not be totally precluded from performing an activity to have a marked limitation, as long as the degree of limitation seriously limits your ability to function independently, appropriately, and effectively on a sustained basis, and complete work-related mental activities.

20 C.F.R. Part 404, Subpt. P, App. 1, § 11.00

Langford cites only to her hearing testimony where she stated that she had "pretty bad depression with episodes where she stayed in bed and did not want to get up, talk to anyone, see anyone, or watch TV (Tr.1163). She felt like she was down a well (Id.). She would not get out of bed four to six times per month (Tr. 1164). She also had anxiety and panic attacks, with two to three panic attacks a week (Tr. 1165)." (ECF No 9-1 at 20). However, Langford does not explain how these self-reports establish a marked limitation in at least one of the areas of mental functioning: understanding, remembering, or applying information (see 11.00G3b(i)); interacting with others (see 11.00G3b(ii)); concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or adapting or managing oneself (see 11.00G3b(iv)). As discussed above, the ALJ thoroughly explained his conclusion that Langford did not have a marked limitation in any of the areas of mental functioning. (ECF No. 6, PageID #: 1139-1144 (finding that Langford had no more than moderate limitations in her mental functioning)). Langford fails to meet her burden to demonstrate an extreme limitation needed to qualify for disability under Listing 11.14(B).

For these reasons, the ALJ did not err, let alone commit reversible error, when he determined that Langford did not meet Listing 11.14.

### b. The ALJ did not err in his consideration of Langford's side-effects from chemotherapy when formulating the RFC.

Langford also argues that the ALJ failed to consider records demonstrating her neuropathy and fibromyalgia when formulating the RFC. (ECF No. 9-1 at 18). Langford cites to *Griffith v. Colvin*, which states that "a district court cannot uphold an ALJ's decision, even if there 'is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.'" (EFC No. 9-1 at 22

(citing 2014 WL 5858337, at *3 (N.D. Ohio, November 12, 2014) (citing *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011))). Accordingly, a reviewing court must focus on the explanation given by the ALJ's decision without finding further support in the records not specifically included in the decision. As further detailed below, to find substantial evidence here the Court need look no further than the ALJ's decision.

Prior to determining that Langford could perform her past relevant work at Step Four, the ALJ determined Langford's RFC. The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 416.945(a). Here, the ALJ determined that Langford had the ability:

> to perform sedentary work as defined in 20 CFR 404.1567(a) except handle, finger, and feel frequently bilaterally; frequently push/pull with the bilateral lower extremities; climb ramps and stairs occasionally; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; never work at unprotected heights, near hazardous machinery, or perform commercial driving; can understand, remember, carry out, and complete tasks with no strict production rate pace requirements; can adapt to occasional superficial interactions with supervisors, coworkers, and the public, with "superficial" defined as no arbitration, mediation, negotiation, confrontation, or being responsible for the safety or supervision of others; and can adapt to routine workplace changes.

(ECF No. 6, PageID #: 1144). When supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive – even if this court might reach a different conclusion or if the evidence could have supported a different conclusion. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."); *Biestek v. Comm'r of Soc. Sec.,* 880 F.3d 778, 783 (6th Cir. 2017) ("It is not our role to try the case *de novo*." (quotation omitted)). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen*, 800 F.2d at 545.

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96-8p, 1996 WL 374184, at *7 ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). The RFC is for the ALJ to determine; however, it is well established that the claimant bears the burden of establishing the impairments that determine her RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

Langford argues that the ALJ failed to consider "the cumulative nature of Langford's fibromyalgia and peripheral neuropathy." (ECF No. 9-1 at 21). In support, Langford cites to various treatment records that she alleges document that she had chemotherapy-induced neuropathy and/or fibromyalgia. (ECF No. 9-1 at 21 (citing Tr. 323, 330, 331, 353, 385, 733, 759, 763, 823, 945, 1524, 1527-1531, 1532, 1534, 1592, 2399-2400)). The Commissioner argues that the ALJ considered Langford's fibromyalgia and neuropathy throughout his decision (ECF No. 11 at 11 (citing Tr. 1103-32)). The Commissioner notes that "[Langford] makes a brief argument that the ALJ did not consider the effects of her fibromyalgia, in combination with her neuropathy, and how these conditions would prevent her ability to perform her past relevant work or any substantial gainful activity (Pl. Br. 21). However, [ ] [Langford] has not pointed to any evidence the ALJ did not consider or misconstrued in his analysis of her fibromyalgia." (ECF No. 11 at 10 n. 4).

25

The ALJ acknowledged Langford's neuropathy and fibromyalgia diagnosis and agreed that they were severe impairments at Step Two.[1] In his determination of the RFC, the ALJ included a lengthy summary of the medical evidence and then ALJ detailed his analysis as follows:

> [Langford's] allegations regarding very limited use of her upper extremities due to numbness and tingling, shortness of breath even with talking, and difficulty sustaining even sedentary exertion, are not entirely consistent with the medical evidence. Her exam findings do not suggest such a degree of physical functional limitation. On June 14, 2019, her gait was slow; she had lumbar pain and reduce range of motion; she had no edema; she had normal strength throughout the upper and lower extremities; and her breathing and heart sounds were normal (17F/15). At exam on June 25, 2019, she had normal motor strength in the upper and lower extremities; her gait was normal; she had no edema; and her heart and breathing sounds/signs were unremarkable (17F/11). Her exam was substantially similar on July 9, 2019 (17F/8). At exam on October 2, 2019, her gait was steady and unassisted; she had 14-16/18 tender points; she had positive facet loading pain in the lumbar spine; and straight leg raises elicited some discomfort (16F/11). Her exams were substantially similar on November 17, 2019 (16F/17) and February 24, 2020 (16F/21). At exam on August 24, 2020, the

---

[1] The ALJ also specifically stated that he considered Langford's fibromyalgia individually and in combination with her other impairments at Step Three. The ALJ stated:

> The undersigned has considered the claimant's fibromyalgia consistent with Social Security Ruling 12-2p. The Ruling notes when a claimant seeks disability due to fibromyalgia, the undersigned must properly consider the claimant's symptoms when deciding the claimant has a medically determinable impairment of fibromyalgia. However, although the claimant has "severe" impairments including fibromyalgia, for which there is no specific Listing, her impairments, considered individually and in combination, do not meet the criteria of any of the listed impairments described in Appendix 1 of the Regulations (20 CFR. Subpart P. Appendix 1). The undersigned considered all listed impairments in 20 CFR Part 404, Subpart P. Appendix 1 with specific attention to Listings discussed below; however, the medical evidence fails to establish that claimant's impairments meet or medically equal the relevant Listings.

(ECF No. 6, PageID #: 1138).

claimant had no peripheral edema; her left foot as tender to palpation; she had no muscle atrophy or weakness; her right lower extremity had full range of motion and no weakness; and her sensation to touch and pain was intact bilaterally (22F/3-4). At exam on September 29, 2020, the claimant as noted as "fully active, able to carry on all pre-disease performance w/o restriction"; she was in no acute distress; and her breathing and heart signs/sounds were normal (24F/29). At exam on October 22, 2020, her breathing and heart sounds/signs were unremarkable; and she was in no acute distress (38F/4-5). At exam on December 7, 2020, the claimant had PT following a right heel injury from August of 2020 (24F/16). On exam, aside from her right heel/foot/ankle; she had no tenderness in the left lower extremity; her sensation was intact to light touch in both lower extremities; she had reduced range of motion in the ankles; she had reduced bilateral lower extremity strength primarily in the knees and hips; and her gait was with a crutch (due to right foot injury) (24F/18). On July 15, 2021, she stood erect and ambulated with a normal narrow-based gait; she was able to heel-toe walk without difficulty; she had some limited range of motion in the lumbar spine; sensation was intact to light touch and pinwheel, but diminished in stocking pattern from the knees distally; straight leg raise testing was negative; and there was no apparent muscle atrophy (31F/3).

(ECF No. 6, PageID #: 1147).

It is well settled that ALJs are not required to reference every piece of evidence in their decision. *Conner v. Comm'r of Soc. Sec.*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker*, 99 F. App'x at 665); *Jenkins v. Colvin*, No. 5:15-CV-1165, 2016 WL 825909, at *9 (N.D. Ohio Feb. 11, 2016) ("Although an ALJ is required to *consider* all of the evidence in the record, [s]he is not required to *discuss* each item of evidence in her opinion." (Emphasis in original) (citations omitted)), *report and recommendation adopted*, No. 5:15 CV 1165, 2016 WL 815625 (N.D. Ohio Mar. 1, 2016). The ALJ included evidence favorable and unfavorable to Langford. For example, the ALJ did not ignore the notations of Langford's tender points or her complaints of numbness and tingling. Moreover, several of the records that Langford claims that the ALJ disregarded merely stated neuropathy as a diagnosis. (*See* ECF No 6, PageID #: 355 ("Chemotherapy-induced

27

neuropathy"), 385 ("Chemotherapy-induced neuropathy. Worsening.", 417 ("Chemotherapy-induced neuropathy. Mild"), 765, 795, 855, 1624 ("Sensory neuropathy"), 2431-2432 ("Chemotherapy-induced neuropathy")). The ALJ did not dispute Langford's diagnoses of chemotherapy-induced peripheral neuropathy with fibromyalgia and found the impairment to be severe. (ECF No. 6, Tr. 1116). However, "a diagnosis alone is not enough to establish specific functional limitations as a matter of right." *Thornton v. Saul*, No. 4:20-CV-01420-JRA, 2021 WL 3934332, at *11 (N.D. Ohio June 21, 2021) (citation and internal quotation marks omitted)*, report and recommendation adopted sub nom. Thornton v. Comm'r of Soc*. Sec., No. 4:20CV1420, 2021 WL 4025192 (N.D. Ohio Sept. 2, 2021). The remainder of the records cited by Langford were specifically cited by the ALJ in his decision (ECF No. 6, PageID #: 791 (noted by the ALJ), 977 (Medical Source Statement from Tanya Makowski, discussed by ALJ), 1556 (fibromyalgia) (noted by the ALJ), 1559-1563 (discussed by the ALJ), 1564 (discussed by the ALJ), 1566 (discussed by the ALJ)).[2] The treatment notations that Langford suggests were ignored by the ALJ were either referenced in the decision or notations of a diagnosis of a condition.

Following his explanation of his analysis of the medical evidence, the ALJ further explained that:

> These examination findings support that the claimant has been limited to less than a full range of sedentary exertion, with additional limitations on use of her upper and lower extremities, postural activities, climbing, and environmental factors, as set forth in the above residual functional capacity assessment. They do not suggest disabling limitations with use of her upper extremities, sitting, standing, walking, postural activities, or exposure to hazards. The undersigned is cognizant that the degree of limitation that a person might experience from fibromyalgia and other impairments might not necessarily be reflected in a particular treatment note; however, in the instant matter, the longitudinal record does not reflect a

---

[2] Langford also cites to Tr. 330 (ECF No. 6, PageID #: 362, Ex. 2F at 31). It is unclear why this record was cited and Langford does not elaborate.

> significant degree of physical functional limitation from the
> claimant's physical impairments. Her physical examinations do not
> reflect the degree and frequency of pain one would expect based on
> her testimony. The physical examinations findings also do not
> support loss of strength, range of motion, sensation, reflexes, or
> coordination that would support a disabling degree of physical
> limitation. The medical evidence, even with a consideration of
> limitations from pain, does not support a greater degree of limitation
> than that which is set forth in the above residual functional capacity
> assessment.

(ECF No. 6, PageID #: 1147). This demonstrates that the ALJ reasonably explained how he

considered Langford's neuropathy and fibromyalgia and how he accommodated these symptoms

when he formulated her RFC. Langford has not cited to any evidence that the ALJ failed to

consider or misconstrued in his analysis of her neuropathy or fibromyalgia.

Accordingly, substantial evidence shows that the ALJ properly considered Langford's

side-effects from chemotherapy, including her neuropathy and fibromyalgia, when formulating the

RFC. As long as substantial evidence supports the Commissioner's decision, the Court must defer

to it, "'even if there is substantial evidence in the record that would have supported an opposite

conclusion[.]'" *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003) (quoting *Key v. Callahan*,

109 F.3d 270, 273 (6th Cir. 1997)); *see Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) ("The

findings of the Commissioner are not subject to reversal merely because there exists in the record

substantial evidence to support a different conclusion.") (citations omitted).

### 2. The ALJ's evaluations of the medical opinions are supported by substantial evidence.

In Langford's second issue, she again attempts to raise numerous discrete and unrelated

arguments in a manner that is neither clear nor appropriately developed. The Court finds that

Langford sufficiently identified as issues: whether the ALJ erred in his evaluations of the

following: a) the June 27, 2019 opinion of Kathleen Ashton and Dr. Laurel Ralston (ECF No. 9-1

at 24-25); b) the July 9, 2019 opinion of Tanya Makowski (ECF No. 9-1 at 25-26); and c) the May 17, 2021 opinion of state agency reviewing consultant Jennifer Swain (ECF No. 9-1 at 26-27); and d) the November 9, 2020 opinion of Dr. Bryan Krabbe. Any other potential issues were raised in a perfunctory manner, without developed argument, and are therefore deemed waived. *McPherson*, 125 F.3d at 995–996.

Langford filed her application for benefits in 2018; thus, the new regulations governing the consideration of opinion evidence apply. 20 C.F.R. §§ 404.1520(e). *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017). The regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)." C.F.R. § 404.1520c(a). Nevertheless, an ALJ must "articulate how he considered the medical opinions and prior administrative medical findings" in adjudicating a claim. 20 C.F.R. § 404.1520c(a). Medical source opinions are evaluated using the factors listed in 20 C.F.R. § 404.1520c(c). The factors include: supportability; consistency; the source's relationship with the claimant; the source's specialized area of practice, if any; and "other factors that tend to support or contradict a medical opinion." 20 C.F.R. §§ 404.1520c(c), 404. 1520c(b)(2) ("The factors of supportability [ ] and consistency [ ] are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions ...."). The ALJ must explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2).

### a.  Laurel Ralston, MD & Kathleen Ashton – June 27, 2019

On June 27, 2019, Kathleen Ashton and Dr. Laurel Ralston completed a "Mental Impairment Questionnaire" on behalf of Langford. (ECF No. 6, PageID #: 12F). With respect to

Langford's ability to sustain concentration and persistence, they opined that Langford had no useful ability to manage regular attendance and be punctual within customary tolerance and would be unable to meet competitive standards in: maintaining attention and concentration for extended periods; performing activities within a schedule; working in coordination with or in proximity to others without being distracted by them; completing a normal workday and workweek without interruptions from psychologically based symptoms; and performing at a consistent pace without an unreasonable number and length of rest periods. The remainder of Langford's mental functions were opined to be either limited but satisfactory or seriously limited but not precluded. (ECF NO. 6, Ex. 12F at 1-2). "Seriously limited, but not precluded means ability to function in this area is less than satisfactory, but not precluded in all circumstances. Individual would be limited in their ability to perform activity 15% of time." (ECF No. 6, Ex. 12F at 1-2). "Unable to meet competitive standards means your patient cannot satisfactorily perform this activity Independently, appropriately, effectively and on a sustained basis in a regular work setting." (ECF No. 6, Ex. 12 at 1-2). "No useful ability to function, an extreme limitation, means your patient cannot perform this activity in a regular work setting." (ECF No. 6, Ex. 12F at 2). Ashton and Ralston opined that Langford would be absent two to three days a week due to her mental impairments. (ECF No. 6, Ex. 12F at 2). Finally, Ashton and Ralston opined that Langford's impairments would cause her to be off task 50% of the workday. (ECF No. 6, Ex. 12F at 2). On December 16, 2021, Ashton reviewed the June 2019 opinion and her current treatment notes and affirmed the limitations contained in that opinion were consistent with Langford's (then) current level of functioning. (ECF No. 6, Ex. 37F at 3).

The ALJ found the June 2019 opinion unpersuasive and explained that:

> Dr. Ashton's opinion is not persuasive because she did not discuss what evidence she reviewed in forming her opinion. She did

31

however, put in treatment notes from May 6, 2019, which indicated the claimant was upset about her niece passing away from cancer (12F/3). However, the treatment evidence as a whole does not support nor is it consistent with such severe limitations. The claimant's reported daily functioning does not support more than a fair or mild limitation in understanding, remembering, or applying information or more than a fair or moderate limitation in any other areas of mental functioning. She also noted that she is able to perform lighter household; she likes to read; and she watches television (Testimony). At the consultative exam on May 16, 2018, the claimant reported that her activities of daily living are not impacted by her psychological symptoms (6F/4). At a psychological consultative exam on November 9, 2020, the claimant noted that she is able to attend to daily hygiene, perform household chores, shop for groceries, and prepare basic meals, but slowly due to physical pain (23F/4). The treatment notes above also indicates that the claimant took care of her husband after surgery, goes shopping, and is doing better with chores (12F/3).

(ECF No. 6, ALJ Dec. at 26). Langford argues that the ALJ's explanation for finding the June 2019 opinion unpersuasive contradicts the record evidence.[3] Specifically, Langford takes issue with the ALJ's explanation that the assessment was not persuasive because Ashton did not discuss what evidence was reviewed in forming the opinion. (ECF No. 9-1 at 25). This, however, is a correct observation; the medical assessment does not discuss what evidence was reviewed in forming the opinion. (*See* ECF No. 6, Ex. 12F at 1-2). When asked to "[D]escribe the clinical findings including results of mental status examination that demonstrate the severity of your patient's mental impairment and symptoms", Ashton wrote "see attached". (ECF No. 6, Ex. 12F at 1-2). Attached to the assessment are progress notes from an office visit on May 6, 2019. (ECF No. 6, Ex. 12F at 3-4). These progress notes contain mostly subjective statements from Langford. The objective statements included only that Langford arrived late at the appointment, had "good

_____

[3] The ALJ also found the December 2021 opinion unpersuasive. (ECF No. 9-1, ALJ Dec. 30-32). Langford does not take issue with the ALJ's analysis and conclusion regarding the December 2021 opinion. (*See* ECF No. 9-1 at 24-25).

grooming", and made eye contact. None of the notes nor the assessment include a discussion of what evidence was reviewed in forming the opinion. Accordingly, the Court finds no error in the ALJ's observation that there was no discussion about what evidence was reviewed when making the assessment.

Moreover, substantial evidence supports the ALJ's determination to find the opinion unpersuasive. First, the ALJ explained that the severity of the limitations was not supported by the records attached to the assessment. Next, the ALJ explained how the opined limitations are not consistent with Langford's treatment as a whole. The ALJ supported these statements with specific references to the record. (ECF No. 6, ALJ Dec. at 26).

Langford cites to additional records from her treatment with Ashton; specifically, Langford's treatment with Ashton in September of 2018 (ECF No. 9-1 at 24 (citing to Ex. 9F)), October 10, 2018 (15F at 16), October 24, 2018 (15F at 23), November 7, 2018 (15F at 31), November 20, 2018 (Ex. 15 at 62), December 6, 2018 (15F at 78), January 3, 2019 (15F at 88), and February 14, 2019 (15F at 85). Langford argues that "[t]hese treatment notes supported [Ashton and Raltson's] conclusions that the combination of Langford's psychological impairments, including panic attacks and struggling to stay focused (Tr. 1076) resulted in the limitations as set forth in their assessment." (ECF No. 9-1 at 25). Even though the ALJ did not specifically mention these records in his explanation of the June 27, 2019 opinion, it is clear from elsewhere in the opinion that these records were reviewed and considered. In the ALJ's explanation for finding the Ashton's December 16, 2021 opinion unpersuasive he stated:

> The treatment evidence as a whole does not support nor is it consistent with such severe limitations. The claimant's reported daily functioning does not support more than a fair or mild limitation in understanding, remembering, or applying information or more than a fair or moderate limitation in any other areas of mental functioning. She also noted that she is able to perform lighter

household; she likes to read; and she watches television (Testimony). At the consultative exam on May 16, 2018, the claimant reported that her activities of daily living are not impacted by her psychological symptoms (6F/4). At a psychological consultative exam on November 9, 2020, the claimant noted that she is able to attend to daily hygiene, perform household chores, shop for groceries, and prepare basic meals, but slowly due to physical pain (23F/4). The treatment notes above also indicates that the claimant took care of her husband after surgery, goes shopping, and is doing better with chores (12F/3).

The claimant's mental status examination findings do not support more than a moderate limitation in understanding, remembering, or applying information or a marked limitation in any other area of mental functioning. From the alleged onset date, clinical findings include a depressed and anxious mood, but good eye contact, being attentive and cooperative, and good judgment and insight (10F/16, 19; 11F/6; 15F/87, 129). At the consultative exam on May 16, 2018, the claimant was cooperative, and her mood and affect were depressed (6F/5). On June 14, 2019, her mood and affect were flat (17F/15). Her exam was substantially similar on June 25, 2019 (17F/11) and July 9, 2019 (17F/8). At exam on October 2, 2019, she was fully oriented; her affect was appropriate; her speech was clear; and her thoughts were organized (16F/11). Her exam was substantially similar on November 17, 2019 (16F/17), February 24, 2020 (16F/21), and September 29, 2020 (24F/29).

At a psychological consultative exam on November 9, 2020, she was cooperative; she conversational speed was within normal limits; she displayed no looseness of associations, flight of ideas, or delusions; her receptive language was adequate; she had no problems attending to simple instructions; she appeared sad; she displayed no autonomic indications of anxiety; she was fully oriented; her recall was average; her concentration was below average; her judgment was sufficient; and her insight was adequate (23F/4-5). At a psychological exam on December 3, 2020, the claimant's mood and affect were depressed and anxious; her grooming was fair; her eye contact was normal; she was fully oriented; her attention and concentration were normal; her speech was normal; her thought process was unremarkable; her thought content was normal; her intellectual functioning was average; her insight intact; and her judgment was normal (24F/24). Her exam was substantially similar on March 3, 2021 (25F/17). On September 22, 2021, she was appropriately groomed; she made good eye contact; her speech was appropriate; she reported her mood was "horrible"; her affect was dysthymic; her thought process was linear and goal-directed; her

attention/concentration were intact; her recent and remote memory were intact; and her insight and judgement were fair (35F/390). While these examinations show some degree of impairment, they do not show more than a mild limitation in understanding, remembering, or applying information or more than a moderate limitation in any other areas of mental functioning.

After reviewing the medical evidence of record available, including some of the aforementioned mental status examination findings, the state agency psychological consultant on reconsideration opined that the claimant has mild limitations in understanding, remembering, or applying information; and moderate limitations in the other areas of mental functioning (11A/4-5). She opined further that the claimant can perform duties which are static and changes can easily be explained, in a setting without strict production demands; she can engage in occasional, superficial interaction with coworkers and supervisors; and she is able to perform duties which are routine and predictable in a setting where changes that do occur can be previewed prior to implementation (11A/8-10). The aforementioned reported daily functioning, examination findings, and persuasive portions of the medical opinions do not support the serious mental functional limitation noted by Dr. Ashton. Accordingly, the undersigned finds this opinion unpersuasive.

(ECF No. 9-1, ALJ Dec. 30-32).

The records Langford cites to, Ex. 9F and 15F, were specifically mentioned by the ALJ in his explanation for finding the December 16, 2021 opinion unpersuasive. The ALJ explicitly considered the treatment notes from Ashton and Ralston throughout his decision, noting Dr. Ashton's observation of depressed mood and decreased motivation in social interactions, but also discussing how, with help from Dr. Ashton, Langford was learning ways to manage her anxiety and depression (ECF No. 6, Tr. 1116, citing Tr. 877-79, 1034). The ALJ also noted that clinical findings as a whole, including those from appointments with these providers, showed mixed results with a depressed and anxious mood, but good eye contact, good judgment, and good insight, as well as being cooperative and attentive (ECF No. 6, Tr. 1107-09, 1111, 1116 (citing Tr. 911, 913-14, 1035, 1077)). Langford's attack on the ALJ's opinion merely asks the Court to reweigh the

evidence in her favor. "But the Court does not reweigh evidence when reviewing an ALJ's determination." *McQuade v. Comm'r of Soc. Sec.*, No. 1:21CV834, 2022 WL 4375984, at *2 (N.D. Ohio Sept. 22, 2022); *Avers v. Kijakazi*, No. 3:20-CV-01433, 2021 WL 4291228, at *5 (N.D. Ohio Sept. 21, 2021) ("the court does not review the evidence de novo, make credibility determinations, or weigh the evidence (citing *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989))).

Accordingly, substantial evidence supports the ALJ's conclusion that Ralston and Ashton's June 27, 2019 opinion was unpersuasive.

### b. Dr. Sanjay Choudhary & Tanya Makowski, CNP - July 9, 2019 and restated/adopted on December 14, 2021

On July 9, 2019, certified nurse practitioner Tanya Makowski completed a "Physical Medical Source Statement" on behalf of Langford. (ECF No. 6, Ex. 14F). The Statement was also stamped by Dr. Sanjay Choudhary. (ECF No. 6, Tr. 948, Ex. 14F at 4). Makowski had been treating Langford for approximately two months and indicated that Langford had "significant tenderness, tightness, weakness, [and] no fine motor skills or ability to grasp". (ECF No. 6, Tr. at 945, Ex. 14F at 1). Makowski opined that Langford could sit for 15 minutes at a time, stand for 10 minutes at a time and sit and stand/walk for less than two hours total in an 8-hour workday. (ECF No. 6, Tr. at 946, Ex. 14F at 2). Makowski opined that Langford would need unscheduled breaks during the workday for 15-20 minutes occurring approximately every hour. (ECF No. 6, Tr. at 946, Ex. 14F at 2). Makowski opined that Langford could never lift over 20 pounds but gave no opinion on Langford's ability to lift ten pounds or up to ten pounds. (ECF No. 6, Tr. at 947, Ex. 14F at 3). Makowski opined that Langford had significant limitations with reaching, handling, or fingering and indicated that she could grasp, turn, or twist objects only 5% of the time; never engage in fine manipulations; reach in front of her body 5% of the time; and reach overhead 2-3% of the time.

(ECF No. 6, Tr. at 947, Ex. 14F at 3). She opined Langford would be off task 25% or more of the time, was incapable of even "low stress" work, was likely to have good and bad days, would be absent more than four days per month due to her limitations. (ECF No. 6, Tr. at 947-948, Ex. 14F at 3-4). When asked to describe other limitations that would affect Langford's ability to work, Makowski stated "ptsd, anxiety, depression, neuropathy". (ECF No. 6, Tr. at 948, Ex. 14F at 4). On December 14, 2021, Makowski reviewed and adopted the July 2019 opinion without changes or additions. (ECF No. 6, Tr. 2730, Ex. 30F at 1).

The ALJ found Choudhary and Makowski's opinions unpersuasive and explained:

> they are not supported and are inconsistent with the medical record as to such limitations on use of her upper extremities, limitations on total sitting and standing/walking, off-task tolerance, and absenteeism. The opinions lack clear explanation supporting off-task and absenteeism. The claimant's examination findings also do not support such a degree of limitation as to use of her upper extremities, sitting, standing, or walking. On June 14, 2019, her gait was slow; she had lumbar pain and reduce range of motion; she had no edema; she had normal strength throughout the upper and lower extremities; and her breathing and heart sounds were normal (17F/15). At exam on June 25, 2019, she had normal motor strength in the upper and lower extremities; her gait was normal; she had no edema; and her heart and breathing sounds/signs were unremarkable (17F/11). Her exam was substantially similar on July 9, 2019 (17F/8). At exam on October 2, 2019, her gait was steady and unassisted; she had 14-16/18 tender points; she had positive facet loading pain in the lumbar spine; and straight leg raises elicited some discomfort (16F/11). Her exams were substantially similar on November 17, 2019 (16F/17) and February 24, 2020 (16F/21). At exam on August 24, 2020, the claimant had no peripheral edema; her left foot as tender to palpation; she had no muscle atrophy or weakness; her right lower extremity had full range of motion and no weakness; and her sensation to touch and pain was intact bilaterally (22F/3-4). At exam on September 29, 2020, the claimant as noted as "fully active, able to carry on all pre-disease performance w/o restriction"; she was in no acute distress; and her breathing and heart signs/sounds were normal (24F/29). At exam on October 22, 2020, her breathing and heart sounds/signs were unremarkable; and she was in no acute distress (38F/4-5). At exam on December 7, 2020, the claimant had PT following a right heel injury from August of

2020 (24F/16). On exam, aside from her right heel/foot/ankle; she had no tenderness in the left lower extremity; her sensation was intact to light touch in both lower extremities; she had reduced range of motion in the ankles; she had reduced bilateral lower extremity strength primarily in the knees and hips; and her gait was with a crutch (due to right foot injury) (24F/18). On July 15, 2021, she stood erect and ambulated with a normal narrow-based gait; she was able to heel-toe walk without difficulty; she had some limited range of motion in the lumbar spine; sensation was intact to light touch and pinwheel, but diminished in stocking pattern from the knees distally; straight leg raise testing was negative; and there was no apparent muscle atrophy (31F/3). These examination findings support that the claimant has been limited to less than a full range of sedentary exertion, with additional limitations on use of her upper and lower extremities, postural activities, climbing, and environmental factors, as set forth in the above residual functional capacity assessment. They do not support the inability to sit, stand, or walk for even 2 hours, they do not suggest significant limitations on use of the upper extremities, and they do not provide support for the opinions regarding absenteeism and off-task limitations, as opined by Dr. Choudhary and nurse Makowski.

Their opinions also lack support by other qualified medical sources, who had the benefit of reviewing the more complete record and with the benefit of program knowledge. After reviewing the medical evidence of record available to them, including some of the aforementioned physical examination findings and imaging, the state agency medical consultants opined that the claimant is limited to light exertion, with standing and/or walking for 4-6 hours; occasional climbing of ramps or stairs, balancing, stooping, crouching, and crawling; never climbing ladders, ropes, or scaffolds; frequent handling and fingering bilaterally; most avoid all exposure to hazardous machinery, unprotected heights, and performing commercial driving (9A/7-8; 11A/6-8); and no more than frequent bilateral push/pull with the lower extremities (3A/12-14). These opinions do not support Dr. Choudhary and nurse Makowski's conclusions. Their opinions as to "low stress work" are unsupported by the fact that they provide physical health treatment services. Nonetheless, the above residual functional capacity assessment includes limitations on pace to accommodate relative stress. For these reasons, and based on this evidence, the undersigned finds Dr. Choudhary and nurse Makowski's opinions unpersuasive.

(ECF No. 6, Tr. 1134-1135).

Langford argues that the ALJ's finding was in error because the record contained treatment notes that supported the opinion. (ECF No. 9-1 at 26). However, Langford's argument merely highlights that there may be substantial evidence to support an alternative conclusion. (ECF No. 9-1 at 26). This is not enough to disturb the ALJ's finding. As long as substantial evidence supports the Commissioner's decision, the Court must defer to it, "'even if there is substantial evidence in the record that would have supported an opposite conclusion[.]'" *Wright*, 321 F.3d at 614 (quoting *Key*, 109 F.3d at 273)*; see Buxton*, 246 F.3d at 772 ("The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.")(citations omitted).

Here, the ALJ's decision properly discusses the supportability and consistency of the opinions with the record evidence. *See* 20 C.F.R. § 404.1520c(c)(1)-(2) (medical opinions evaluated for supportability and consistency). The ALJ cited to specific instances in Choudhary's treatment notes when he explained why the extreme limitations were not supported. (ECF No. 6, Tr. 1128-29). Additionally, The ALJ explained why the objective findings in the remainder of the record were not consistent with the extreme restrictions opined by Choudhary and Makowski. (ECF No. 6, Tr. 1128-29).

Accordingly, the Court finds no error in the ALJ's evaluation of these opinions.

### c.  Jennifer Swain, Ph.D. – May 17, 2021

On May 17, 2021, state agency psychological consultant Jennifer Swain, Ph.D. provided her opinion on Langford's mental functioning abilities. (ECF No. 6, Tr. at 1215-1216, Ex. 11A at 4-9). Swain opined that Langford had a mild limitation in her ability to understand, remember, or apply information and moderate limitations in her abilities to interact with others, concentrate, persist, or maintain pace, and adapt or manage herself. (ECF No. 6, Tr. at 1215, Ex. 11A at 4). She

opined further that the claimant can perform duties which are static and changes can easily be explained, in a setting without strict production demands; she can engage in occasional, superficial interaction with coworkers and supervisors; and she is able to perform duties which are routine and predictable in a setting where changes that do occur can be previewed prior to implementation (11A/8-10). The ALJ found Swain's opinion persuasive:

> because it is supported by the evidence the doctor reviewed, and it is consistent with the other evidence of record. The evidence of record developed after the doctor rendered the opinion did not change materially or in a manner that would otherwise render it inconsistent with the record generally. Moreover, the doctor's opinion is informed by program knowledge and expertise in psychology.

(ECF No. 6, Tr. at 1124).

Langford argues that the ALJ's findings were "misstated", although her precise criticism of the ALJ's explanation is unclear. (ECF No. 9-1 at 26-28). Langford appears to take issue with the ALJ's finding that Swain's opinion that Langford had moderate limitation in her ability to carry out detailed instructions was consistent with the evidence in the record. It is unclear whether Langford believes that the ALJ failed to include a limitation in the RFC accounting for this moderate limitation, or whether Langford believes the record supports a greater limitation in this area of functioning. Both arguments fail.

To the extent Langford alleges that the ALJ failed to accommodate Swain's opinion that she would have a "moderate limitation in her ability to carry out detailed instructions", this argument fails. Although the ALJ found Swain's opinion to be persuasive, he did not adopt it verbatim. Instead, the ALJ explained

> With respect to specific mental functional limitations, the undersigned utilized more vocationally relevant terminology when articulating the claimant's specific mental functional limitations. While the undersigned did not adopt the state agency psychological

40

> consultant's opinion verbatim, the undersigned found the general
> theme of these specific limitations persuasive when formulating the
> above residual functional capacity assessment.

(ECF No. 6, Tr. at 1124). With respect to the mental limitations contained in the RFC, the ALJ

found that Langford "can understand, remember, carry out, and complete tasks with no strict

production rate pace requirements; can adapt to occasional superficial interactions with

supervisors, coworkers, and the public, with 'superficial' defined as no arbitration, mediation,

negotiation, confrontation, or being responsible for the safety or supervision of others; and can

adapt to routine workplace changes." (ECF No. 6, Tr. 1112). Although Swain opined that Langford

had a "moderate limitation in her ability to carry out detailed instructions", she further explained that

Langford retained the ability to perform duties that are static with changes that can be easily

explained, in a setting without strict production demands. (ECF No. 6, Tr. 1220, Ex. 11A at 9).

These limitations are reflected in the ALJ's RFC finding. (ECF No. 6, Tr. 1112).

To the extent Langford alleges that the ALJ should have included greater limitations than

those opined by Swain, this argument also fails. Langford states that the ALJ erred by relying on

Swain's opinion, which itself was based on an alleged incomplete review of Langford's medical

records. (ECF No. 9-1 at 27). Langford relies on this Court's decisions in *Gonzales v. Comm'r of

Soc. Sec.*, No. 3:21cv93, 2022 WL 824145, at *10 (N.D. Ohio Mar. 18, 2022) and *Fergus v.

Comm'r of Soc. Sec.*, No. 5:20cv2612, 2022 WL 743487, at *12 (N.D. Ohio Mar. 11, 2022) in

support of her argument that because Swain did not have access to Langford's earlier file, which

Langford argues supported greater limitations, the matter must be remanded. (ECF No. 9-1 at 27).

However, Langford's reliance on these cases, both of which were remanded following the

application of the rule set forth in *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 908, 912 (N.D.

Ohio 2008), is misplaced.[4]

In *Deskin*, the Northern District of Ohio held that an ALJ may make a "commonsense judgment about functional capacity even without a physician's assessment," but only when "the medical evidence shows relatively little [ ] impairment." 605 F. Supp. 2d at 912 (quoting *Manso-Pizarro v. Sec'y of Health & Hum. Servs.*, 76 F.3d 15, 17 (1st Cir. 1996)). The *Deskin* court articulated the rule as follows: "[W]here the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations (or only an outdated nonexamining agency opinion), to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing." *Deskin*, 605 F. Supp. 2d at 912. After some criticism from other district courts in the Sixth Circuit, the *Deskin* court clarified its decision. *See Kizys v. Comm'r of Soc. Sec.*, No. 3:10 CV 25, 2011 WL 5024866 (N.D. Ohio Oct. 21, 2011). *Kizys* clarified that *Deskin* potentially applies in only two circumstances: 1) when an ALJ made an RFC determination based on no medical source opinion; or 2) when an ALJ made an RFC based on an "outdated" medical source opinion "that does not include consideration of a critical body of objective medical evidence." *See Kizys*, 2011 WL 5024866, at *2; *see also Raber v. Comm'r of Soc. Sec.*, No. 4:12-cv-97, 2013 WL

---

[4] Although Langford has not framed her argument in terms of whether the ALJ's decision ran afoul of *Deskin*, that is what she has effectively argued in her initial brief. And the cases upon which she relied analyze whether a remand under *Deskin* is warranted. In *Gonzales*, this Court found that although the period of medical evidence between the last functional opinion and the ALJ's opinion was only seven months, applied the *Deskin* rule because there was a "critical body" of the "objective medical evidence" that was not accounted for by a medical opinion. *Gonzales*, 2022 WL 824145, at *10. This Court also applied the *Deskin* rule in *Fergus* and remanded the matter despite having three medical opinions on plaintiff's functional abilities "[b]ecause the ALJ had no medical opinions on the [plaintiff's] functional abilities for the majority of the period of disability at issue – four out of the five years examined by the ALJ, and because the ALJ's RFC finding was based on the ALJ's lay conclusion concerning [p]laintiff's reported symptoms and diagnostic testing[.]" 2022 WL 743487, at *12.

1284312, at *15 (N.D. Ohio Mar. 27, 2013) (explaining post-*Deskin* application of the rule).

*Deskin*, however, is not implicated on the facts of this case. First, this is not a situation where the ALJ's determination was based on no medical source opinion. *Raber*, 2013 WL 1284312, at *15. Here, the ALJ evaluated several medical source opinions in reaching Langford's RFC.

Second, the RFC is not based on an "outdated" medical source opinion "that does not include consideration of a critical body of objective medical evidence." *Kizys*, 2011 WL 5024866, at *2. Swain issued her opinion in May 2021, just eight months prior to the ALJ's decision. However, "[t]here will always be a gap between the time the agency expert's review the record and give their opinion…and the time the hearing decision is issued. Absent a clear showing that the new evidence renders the prior opinion untenable, the mere fact that a gap exists does not warrant the expense and delay of a judicial remand." *Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 831 (6th Cir. 2009) (citations omitted). If length of time were the only consideration, the analysis could likely end here. *See Jackson v. Comm'r of Soc. Sec. Admin.*, No. 4:13-CV-929, 2014 WL 2442211, at *7-8 (N.D. Ohio May 30, 2014) (distinguishing *Deskin* on the grounds that less than one year of medical evidence followed the final state agency review of claimant's medical records, the evidence showed some improvement, and the ALJ had assigned significant weight to the opinion of the state agency consultants); *Raber*, 2013 WL 1284312 at * 17 (distinguishing *Deskin* because "the evidence related to [Raber's] condition after the consultative review covered roughly eleven months and showed she was reporting improvement or relief through treatment and did not want surgery.").

The issue, however, is not whether Swain's opinion was outdated, but rather whether the ALJ's reliance on it was misplaced given that it failed to consider the totality of Langford's medical

records.  "There is no categorical requirement that the non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record." *Robinson v. Comm'r of Soc. Sec. Admin.*, No. 5:14-CV-291, 2015 WL 1119751, at *11 (N.D. Ohio Mar. 11, 2015). "The opinions need only be 'supported by evidence in the case record.' " *Id.* (quoting *Helm v. Comm'r of Soc. Sec. Admin.*, 405 F. App'x 997, 1002 (6th Cir. 2011). Indeed, "it is not error for an ALJ to rely on medical opinions from physicians who have not reviewed the entire record so long as the ALJ considers the post-dated evidence in formulating her opinion." *Edwards v. Comm'r of Soc. Sec.*, No. 1:17 CV 925, 2018 WL 4206920, at *6 (N.D. Ohio Sept. 4, 2018) (citing *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009) (indicating that an ALJ's reliance upon state agency reviewing physicians' opinions that were outdated was not error where the ALJ considered the evidence developed post-dating those opinions)).

Langford mistakenly states that Swain considered only "four notes" from the Cleveland Clinic. (*See* ECF No. 9-1). In reaching her opinion, however, Swain considered records from the Cleveland Clinic from May 30, 2016 to April 19, 2021. (*See* ECF No. 6, Tr. 1212-1213, Ex. 11A at 1-2 (citing records created August 20, 2020 (MEGAHIT Triggered request for all records dated 05/30/2016 - 08/20/2020)(18F)), January 5, 2021 (MEGAHIT Triggered request for all records dated 08/20/2020 - 01/05/2021) (24F)), March 16, 2021 (MEGAHIT Triggered request for all records dated 01/05/2021 - 03/16/2021)(25F)), and April 19, 2021 (MEGAHIT Triggered request for all records dated 03/17/2021 - 04/19/2021)(27F)) and the report of the consultative examining psychologist, Bryan Krabbe, Psy.D., dated November 9, 2020 (*see* ECF No. 6, Tr. 1313, Ex. 11A at 2 (Ex. 23F)). Accordingly, it appears that Swain considered evidence from 2016 through 2021 in reaching her opinion regarding Langford's mental functional limitations.

Additionally, even if Swain did not have all the evidence to review, the ALJ did not error so long as he considered the remainder of the evidence. *See Edwards*, 2018 WL 4206920, at *6; *McGrew*, 343 F. App'x at 32. Here, it is clear that the ALJ considered all of the record evidence. (*See* ECF No. 6, Tr. 1115-1122). The ALJ specifically cites to the objective record throughout the decision including evidence post-dating Swain's opinion, which supports his conclusion that Langford did not have greater mental functional limitations.  (*See* ECF No. 6, Tr. 1117-1121). Finally, the ALJ noted that the "evidence of record developed after the doctor rendered the opinion did not change materially or in a manner that would otherwise render it inconsistent with the record generally". (ECF No. 6, Tr. 1124).  Moreover, Langford fails to include what she believes her limitation should have been as she merely states that the medical record supported "greater limitations". (ECF No. 9-1 at 27). Langford also fails to direct the Court to the portions of the record where those greater limitations can be found that the ALJ failed to include. (ECF No. 9-1 at 27). Instead, Langford's attack on the ALJ's opinion again asks the Court to reweigh the evidence in her favor, which this Court will not do. *McQuade*, 2022 WL 4375984, at *2

Accordingly, the ALJ did not err in his analysis of Swain's opinion.

### d.  Bryan Krabbe, Psy.D. – November 9, 2020

On November 9, 2020, upon referral by the Ohio DDD, consultative examiner Bryan Krabbe, Psy.D., examined Langford to assess her mental status as it related to her claim for disability benefits due to a psychological impairment. (ECF. 6, Tr. 2444, Ex. 23F). With respect to Langford's abilities and limitations in understanding, carrying out, and remembering instructions, both one-step and complex, Krabbe noted:

> The claimant performed below average on a brief abstract reasoning activity, a task to assess difficulty understanding instructions. She performed adequately on a brief short-term memory activity, a task to assess difficulty remembering instructions. The claimant

> performed adequately recalling digits forward, a simple structured tasked to assess short-term memory. She was able to converse effectively to complete the evaluation. She did not report problems with learning in school. She reported no significant problems learning work related tasks.

(ECF No. 6, Tr. 2450, Ex. 23F at 6). With respect to Langford's abilities and limitations in sustaining concentration and persisting in work-related activity at a reasonable pace, Krabbe stated:

> The claimant had difficulty completing both serial 7s and serial 3s tasks, which suggests difficulty maintaining attention and focus. The claimant had difficulty recalling digits backwards, a simple structured task to assess attention and concentration. She displayed adequate task persistence when answering questions. She displayed no indication of distraction during the evaluation. She reported difficulty remembering appointments and medication. The claimant described symptoms of depression and anxiety that could result in increased worry and a corresponding decrease in attention and concentration. She described a history of problems with attention and concentration in school. She reported a history of impulsive behavior in school. She did not describe a history of problems with attention and concentration within work environments.

(ECF No. 6, Tr. 2450, Ex. 23F at 6). With respect to Langford's abilities and limitations in maintaining effective social interaction on a consistent and independent basis, with supervisors, co-workers, and the public, Krabbe stated:

> The claimant described a history of problems with teachers and classmates. The claimant functions within adequate limits of intellectual functioning to understand and respond to supervisor feedback and adequately relate to co-workers. On past work performance, she did not describe significant problems in responding appropriately to supervision and to coworkers in a work setting. Her longest period of employment at one company was 12 years. She presented as sad and cried during the evaluation, which may affect level of engagement with co-workers and supervisors. She has no regular social interactions outside of her family.

46

(ECF No. 6, Tr. 2450, Ex. 23F at 7). Finally, with respect to Langford's abilities and limitations in dealing with normal pressures in a competitive work setting, Krabbe noted:

> The claimant endorsed a history of emotional deterioration in response to work pressure. She displayed sadness and cried when discussing past and current pressures. She presented with limited coping skills to adapt to work pressures and may have difficulty responding to changes in work environments. She described symptoms of depression that may compromise her ability to respond to work pressures leading to increased emotional instability and withdraw. She described symptoms of anxiety that may compromise her ability to respond to work pressures leading to increased likelihood of agitation. She has a history of a past suicide attempt. She has never been psychiatrically hospitalized but is prescribed psychoactive medication.

(ECF No. 6, Tr. 2450, Ex. 23F at 7).

The ALJ found Krabbe's opinion partially persuasive and explained "it is vague noting 'showing difficulty' and other similar vague terms, without providing any specific degree or specific mental functional limitations. The more complete record does not support more than mild limitations in understanding, remembering, or applying information, or more than moderate limitations in the other areas of mental functioning." (ECF No. 6, Tr. 1127).

Langford appears to take issue with the ALJ not incorporating Langford's below average ability for brief abstract reasoning, difficulty understanding instructions, and difficulty with maintaining attention and focus as limitations in the RFC. (*See* ECF No. 9-1 at 27-28). The Commissioner argues that the ALJ considered these limitations and reasonably found Krabbe's opinion less than persuasive.

Substantial evidence in the record supports the ALJ's decision to find Krabbe's opinion partially persuasive. First, an ALJ may reject a medical opinion on the basis that the opinion is vague and does not include any specific functional limitation. *See Quisenberry v. Comm'r of Soc. Sec.*, 757 F. Appx. 422, 434 (6th Cir. 2018). Here, the ALJ sufficiently explained his reasons for

finding Krabbe's opinion partially persuasive: it was vague and failed to provide specific functional limitation. (ECF No. 6, Tr. 1127; *see also* ECF No. 6, Tr. 2449-2450, Ex. 23F at 6-7).

Second, although the ALJ did not specifically cite to the inconsistencies when he discussed Krabbe's opinion, the ALJ's decision as a whole sufficiently demonstrates why he did not include greater limitations in Langford's RFC. For example, immediately following the ALJ's discussion of Krabbe's opinion, the ALJ continued:

> The record as a whole does not support nor is it consistent with such severe limitations in any areas of mental functioning and it does not support more than mild limitations as to understanding, remembering, and applying information. The claimant's reported daily functioning does not support more than a fair or mild limitation in understanding, remembering, or applying information or more than a fair or moderate limitation in any other areas of mental functioning. She also noted that she is able to perform lighter household; she likes to read; and she watches television (Testimony). At the consultative exam on May 16, 2018, the claimant reported that her activities of daily living are not impacted by her psychological symptoms (6F/4). At a psychological consultative exam on November 9, 2020, the claimant noted that she is able to attend to daily hygiene, perform household chores, shop for groceries, and prepare basic meals, but slowly due to physical pain (23F/4). The treatment notes above also indicates that the claimant took care of her husband after surgery, goes shopping, and is doing better with chores (12F/3).

> The claimant's mental status examination findings do not support more than a moderate limitation in understanding, remembering, or applying information or a marked limitation in any other area of mental functioning. From the alleged onset date, clinical findings include a depressed and anxious mood, but good eye contact, being attentive and cooperative, and good judgment and insight (10F/16, 19; 11F/6; 15F/87, 129). At the consultative exam on May 16, 2018, the claimant was cooperative, and her mood and affect were depressed (6F/5). On June 14, 2019, her mood and affect were flat (17F/15). Her exam was substantially similar on June 25, 2019 (17F/11) and July 9, 2019 (17F/8). At exam on October 2, 2019, she was fully oriented; her affect was appropriate; her speech was clear; and her thoughts were organized (16F/11). Her exam was substantially similar on November 17, 2019 (16F/17), February 24, 2020 (16F/21), and September 29, 2020 (24F/29).

> At a psychological consultative exam on November 9, 2020, she was cooperative; she conversational speed was within normal limits; she displayed no looseness of associations, flight of ideas, or delusions; her receptive language was adequate; she had no problems attending to simple instructions; she appeared sad; she displayed no autonomic indications of anxiety; she was fully oriented; her recall was average; her concentration was below average; her judgment was sufficient; and her insight was adequate (23F/4-5). At a psychological exam on December 3, 2020, the claimant's mood and affect were depressed and anxious; her grooming was fair; her eye contact was normal; she was fully oriented; her attention and concentration were normal; her speech was normal; her thought process was unremarkable; her thought content was normal; her intellectual functioning was average; her insight intact; and her judgment was normal (24F/24). Her exam was substantially similar on March 3, 2021 (25F/17). On September 22, 2021, she was appropriately groomed; she made good eye contact; her speech was appropriate; she reported her mood was "horrible"; her affect was dysthymic; her thought process was linear and goal-directed; her attention/concentration were intact; her recent and remote memory were intact; and her insight and judgement were fair (35F/390). While these examinations show some degree of impairment, they do not show more than a mild limitation in understanding, remembering, or applying information or more than a moderate limitation in any other areas of mental functioning.

(ECF No. 6, Tr. 1127-1128). The ALJ did not merely focus on Langford's ability to manage her own funds, as argued by Langford. (ECF No. 9-1 at 28). Instead, the ALJ's decision thoroughly explains his mental functional limitation analysis and conclusions.

There is no error in the ALJ's analysis of Dr. Krabbe's opinion.

### 3. The ALJ adequately considered the effects of Langford's depression on her ability to perform her past relevant work.

In her third issue, Langford argues that "[t]he ALJ made a cursory evaluation of the evidence and disregarded any evidence which demonstrated limitations which would have precluded the RFC finding that Langford could perform her past relevant work." (ECF No. 9-1 at 28). Langford argues that the ALJ failed to include greater limitations in his hypothetical to the

49

vocational expert and this resulted in the vocational expert opining that she could perform her past relevant work. (ECF No. 9-1 at 28).

At Step 4, the claimant must prove that she cannot perform her past relevant work as actually or generally performed. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Studaway v. Sec'y of Health & Hum. Serv.*, 815 F.2d 1074, 1076 (6th Cir. 1978) (noting that the claimant "must prove an inability to return to his former type of work and not just to his former job"). In evaluating whether the claimant can perform her past relevant work, the ALJ must make specific factual findings regarding: (1) the claimant's RFC; (2) the physical and mental demands of the past job/occupation; and (3) whether the claimant's RFC would permit a return to his or her past job or occupation. SSR 82-62, 1982 SSR LEXIS 27, at *10 (S.S.A. Jan. 1, 1982). The claimant's RFC represents their maximum physical and mental abilities, despite the "impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what [the claimant] can do in a work setting." 20 C.F.R. § 416.945(a)(1).

After hearing the testimony from Langford, the ALJ asked the vocational expert to describe Langford's past work, which the ALJ described as Accounting Clerk and Rater Traffic Clerk. (ECF No. 6, Tr. 1167). The ALJ then asked the vocational expert a series of hypothetical scenarios including one that he adopted as Langford's RFC. (*See* ECF No. 6, Tr. 1167-1171). Specifically, the ALJ asked the vocational expert to assume the following:

> a hypothetical individual of the Claimant's age and education, and with the past jobs that you described. Further assume that this individual is limited as follows. This is a sedentary exertional hypothetical with the following additional limitations. This individual can frequently push and pull with the bilateral lower extremities. This individual can handle and finger -- this person can handle, finger, and feel frequently bilaterally. This person can only occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, can occasionally balance, stoop, kneel, crouch, and crawl. This individual can never work unprotected heights or near

> dangerous moving machinery, and cannot engage in commercial driving. Additionally, this person can understand, remember, carry out, and complete tasks with no strict production rate base requirements, and adapt to only occasional and superficial interactions with supervisors, coworkers, and the public, and by superficial, I mean no arbitration, mediation, negotiation, confrontation, or being responsible for the safety or supervision of others. And this person can only adapt to routine workplace changes.

(ECF No. 6, Tr. 1167-1168). The vocational expert then opined that such a hypothetical individual would be able to perform both of the past jobs that Langford performed. (ECF No. 6, Tr. 1168). The ALJ confirmed that the vocational expert's testimony was consistent with the DOT and supplemented by his experience and training. (ECF No. 6, Tr. 1168).

Langford claims error in the ALJ's conclusions at Step Four based upon the failure to impose the limitations from the opinions that the ALJ found unpersuasive. (*See* ECF No. 9-1 at 31 ("the ALJ failed to include in his RFC any of the limitations set forth by the treating sources.")). Although Langford argues that that ALJ failed to sufficiently consider Langford's neuropathy and erred by not adopting the mental limitations of her treating source opinions, as set forth above, substantial evidence supports the ALJ's findings and the RFC. Therefore, Langford's final issue is entirely dependent upon a successful resolution of her first two issues. Having found that the ALJ properly explained his reasoning for discounting the opinions detailed above and that substantial evidence supports the RFC, Langford has not demonstrated that the ALJ erred by giving the above hypothetical to the vocational expert. Accordingly, the vocational expert's testimony is substantial evidence supporting the ALJ's finding that Langford had the ability to perform past work based on the limitations set forth in the RFC. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d

541, 548 (6th Cir. 2004) (Commissioner may rely on the testimony of a vocational expert to find

that a claimant possesses the capacity to perform work in the national economy). [5]

Langford's third issue is meritless.

## VI. Conclusion

Based on the foregoing, it the Court AFFIRMS the Commissioner of Social Security's

nondisability finding and dismisses Langford's Complaint.

Dated: April 24, 2023

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE

---

[5] Langford makes a passing reference to there being a "significant discrepancy between the testimonies of the two vocational witnesses." (ECF No. 9-1 at 32). The vocational expert in Langford's first hearing found that she could not perform any of her past work; yet the vocational expert at the hearing at issue in this case found that she could perform her past work. Langford states that the discrepancy is material to the ultimate disposition and requires remand. However, Langford failed to cite any authority in support of her request or further develop the argument. (*See* ECF No. 9-1 at 31-32, ECF No. 13 at 2). Accordingly, this issue is waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones."); *see also Rice v. Comm'r of Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir. 2006) (in a Social Security appeal, noting that a claimant's observations with respect to the ALJ's findings "without elaboration or legal argument, failing even to hint at their legal significance or virtue," are generally waived).